701 F.2d 1095
 UNITED STATES of America, Appellee,
v.
John Lester HARRIS, Appellant.
UNITED STATES of America, Appellee,
v.
Dennis WARREN, Appellant.
UNITED STATES of America, Appellant,
v.
Richard WARREN, Appellee.
UNITED STATES of America, Appellee,
v.
Richard WARREN, Appellant.
 Nos. 82-5049, 82-5052, 82-5181 and 82-5157.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 14, 1983.
Decided March 1, 1983.
 
 Michael W. Patrick, Chapel Hill, N.C., for appellant John Lester harris.
 Edwin R. Ivy, Jr., Orlando, Fla., for appellants Richard Warren and Dennis Warren.
 Mildred M. Matesich, Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., Wm. Bradford Reynolds, Asst. Atty. Gen., Walter W. Barnett, Dept. of Justice, Washington, D.C., on brief), for appellee.
 Before WINTER, Chief Judge, WIDENER, Circuit Judge, and FIELD, Senior Circuit Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 In the prosecution of John Harris, Dennis Warren, and Richard Warren on various federal charges arising out of their management of a migrant labor farm in Wilson, North Carolina, the jury convicted Harris and Dennis Warren of conspiracy to violate the rights of certain laborers to be free from slavery, resulting in the death of one laborer, in violation of 18 U.S.C. Sec. 241.[1] Richard Warren, however, although indicted in the same conspiracy count with Harris and Dennis Warren, was convicted only of the lesser included offense of conspiracy without death resulting, also a violation of 18 U.S.C. Sec. 241. All three were convicted of holding laborer Harvey Rutherford to involuntary servitude in violation of 18 U.S.C. Secs. 2 and 1584.[2] Harris and Dennis Warren were also convicted of holding laborer Craig Connors to involuntary servitude.[3]
 
 
 2
 After sentence was imposed on Richard Warren, the district court granted his motion for a judgment of acquittal on the conspiracy count, ruling that his conviction for a conspiracy not resulting in death was impermissibly inconsistent with the jury's finding, as to Harris and Dennis Warren, that the conspiracy had resulted in death.
 
 
 3
 With the exceptions noted below, defendants have appealed their convictions,[4] and the government has cross-appealed from the judgment of acquittal entered on Richard Warren's conspiracy count. We affirm all of the substantive convictions, 535 F.Supp. 1102, but we reverse Richard Warren's judgment of acquittal on the conspiracy count and reinstate the judgment of conviction and sentence imposed thereon. We see no merit in defendant's contentions that they were denied the effective assistance of counsel.
 
 I.
 Introduction
 
 4
 The prosecutions stemmed from the management of a crew of migrant farm workers who lived and worked on the farm of Cecil Williams and Cecil Williams, Jr., in Nash County, North Carolina, during the summer of 1981. Cecil Williams employed Dennis Warren to provide and supervise a crew of migrant laborers to harvest Williams' crops, including cucumbers, sweet potatoes and tobacco. The crops were harvested by hand. For the season May to October, Williams paid Dennis the sum of $72,000, out of which Warren paid the expenses of the harvesting operation. Dennis was assisted in running the crew by his brother Richard Warren, John Harris and a certain Halsey Norwood.
 
 
 5
 The government's evidence showed that many of the workers for Dennis Warren's camp were recruited by methods ranging from deception to kidnapping. In the camp, workers were charged $35.00 per week for their meals, and additional sums of $1.00 for a pack of cigarettes, $3.00 for a pint of wine and $1.25-$1.50 for beer. These costs were deducted from their wages and although the laborers were supposed to be paid every two weeks, the evidence was that they only received $5.00 each on payday.
 
 
 6
 The evidence also showed that workers were guarded at night and any who tried to flee were picked up and returned by Harris or others. There was proof of actual and threatened physical violence to prevent workers from leaving or to force them to work faster. A house, called the "jail," was used to confine workers who had tried to run away or for other punishment. Harris and Dennis Warren each carried a piece of rubber hose and beat laborers with them. Workers who complained of illness or injuries were denied medical assistance.
 
 
 7
 On September 13, 1981, Robert Anderson, a migrant worker from Philadelphia, died in a bus to which he had been taken after collapsing in the fields. Two autopsies established that the primary cause of death was heat stroke. His death and reports of civil rights violations at the farm precipitated an investigation of conditions at the camp by the FBI which ultimately ripened into these prosecutions.
 
 
 8
 We will describe other facts in the context of the contentions to which they relate.
 
 II.
 Effective Assistance of Counsel
 
 9
 Defendants Dennis and Richard Warren were represented by an attorney who was a member of the law firm which also was counsel for Cecil Williams, who, together with his son, was not charged with any crime but had employed Dennis Warren. After defendants' indictment, the government filed a motion to request a Garcia hearing,[5] in order to inquire into a possible conflict of interest on the part of the defense lawyer. The motion alleged the fact that the lawyer was a member of the law firm which represented Cecil Williams,[6] and the government requested a hearing to determine if the Warrens had knowingly waived their right to independent counsel.[7] Unfortunately, due to a mechanical failure, no transcript was made of that hearing, nor was any written order entered. An agreed statement prepared by counsel to this appeal indicates that the Magistrate who decided the motion does not remember any separate inquiry into this possible conflict. Further, although the prosecutor recalls that the Magistrate found no need for independent counsel, defense counsel does not recollect whether this particular conflict was discussed or ruled upon. In any event, no change in representation occurred; the lawyer who was a member of the law firm representing Williams continued to represent the Warrens.
 
 
 10
 Defendants now contend that this conflict resulted in an adverse effect on the law firm's presentation of the Warrens' defense and hence violated their Sixth Amendment right to effective assistance of counsel.[8] First, the defendants claim that although counsel promised during opening argument to place Williams on the stand to testify that he often spoke to the workers and heard no complaints, Williams was never called by the defense. Defendants argue that the law firm, nervous that Williams might implicate himself in the day-to-day running of the farm, instead refused to call Williams as a defense witness and devoted the cross-examination of Williams to an attempt to distance Williams from any interaction with the laborers. Defendants suggest that this "change of heart" might have been prompted by one hearsay statement by a laborer, not admitted by the district court, which alleged that Williams had ordered Harris to "kick some butt" to get the work done, and by several statements by workers that they were "afraid" to go to Williams to complain. Thus, defendants argue that they were deprived of their key witness, especially damaging after his testimony had been promised during opening argument. Second, defendants contend that the conflict deprived them of a possible "I was only following orders" defense, which they argue could have been asserted in mitigation of either culpability or punishment.
 
 
 11
 The applicable legal standard, as set forth in Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980), is that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." On the basis of the record as presently developed, we find neither actual conflict nor adverse effect.
 
 
 12
 First, the evidence adduced at trial simply did not indicate that Williams faced a significant risk of becoming implicated in the criminal conduct. The statements by laborers that they were afraid to go to Williams actually indicated that they were afraid that, if they complained to Williams and the defendants found out, the defendants would hurt them. Moreover, there simply is no evidence in the record (other than that one inadmissible statement) to indicate that Williams ever issued any orders or instructions to the defendants on how to manage the workers.[9] Therefore, we think that, on the present record, no actual conflict has been established.
 
 
 13
 Second, an examination of the record reveals that defense counsel did undertake vigorously to cross-examine Williams when he testified as a government witness as to his dealings with the laborers, and that it was actually the district court that limited this cross-examination, ruling that such questions would have to be put to Williams when later called by the defense. Further, it appears that the decision not to call Williams for the defense was part of a purposeful defense strategy, forcefully urged in closing argument, that the government had not made out its affirmative case.[10] Thus, we conclude that, on the present record, no showing has been made that defense counsel's performance was adversely affected. Defendants' Sixth Amendment claim must therefore be rejected.[11]
 
 III.
 The Secs. 2 and 1584 Convictions
 
 14
 A. Holding Craig Connors to Involuntary Servitude
 
 
 15
 Although both Harris and Dennis Warren were convicted of holding laborer Craig Connors to involuntary servitude under 18 U.S.C. Secs. 2 and 1584, only Harris has appealed his conviction. He challenges the legal sufficiency of the evidence to convict him.
 
 
 16
 While we have never considered the question of what conduct amounts to a holding for involuntary servitude under Sec. 1584, we recently dealt with the definition of "involuntary servitude" under 18 U.S.C. Sec. 1583. In United States v. Booker, 655 F.2d 562, 566-67 (4 Cir.1981), we affirmed a conviction under Sec. 1583, for kidnapping with intent to hold the person to involuntary servitude, in the context of a migrant labor camp, noting that "the statute must be read not only to render criminal the evil Congress sought to eradicate so long ago but, as well, its Twentieth Century counterpart." Finding that the defendant had contributed to "the climate of fear pervading Booker's camp created by the beatings and assaults on the workers and threats of like treatment" and to the "threat of violence or confinement, backed sufficiently by deeds," and noting that the availability of escape does not preclude a finding of involuntary servitude, we found that statute satisfied. See also United States v. Bibbs, 564 F.2d 1165 (5 Cir.1977) (beatings and threats of bodily harm), cert. denied, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). However, it is clear that a mere reminder by the employer that the consequences of leaving will be exceedingly bad (e.g., deportation) is not enough. See United States v. Shackney, 333 F.2d 475 (2 Cir.1964).
 
 
 17
 Harris contends that there was no evidence that he personally ever assaulted Connors or threatened him with harm. The evidence revealed that Connors voluntarily came to the farm and that, when he tried to leave, Dennis Warren ordered him, at gunpoint, to return. Harris, however, was not involved in this incident.
 
 
 18
 We believe, nonetheless, that sufficient other evidence was adduced to convict Harris under 18 U.S.C. Secs. 2 and 1584. First, Connors testified that he saw Harris physically beat other workers, contributing to the reign of physical terror at the farm. Second, Connors stated that Harris had stood guard outside the laborers' door at night, in order to prevent them from leaving. The combination of that guarding, which constituted personal involvement, with the beating of other workers, which sufficed to make Harris an aider and abettor, see United States v. Booker, supra, 655 F.2d at 566 n. 4, constituted sufficient evidence to support the conviction.
 
 
 19
 B. Holding Harvey Rutherford to Involuntary Servitude
 
 
 20
 Both Richard and Dennis Warren challenge the sufficiency of the evidence supporting their conviction for holding laborer Harvey Rutherford to involuntary servitude under 18 U.S.C. Secs. 2 and 1584. We think that the evidence clearly was sufficient to support Dennis Warren's conviction. When Rutherford spoke to another worker about leaving, Dennis told him that, if he left, he could get hurt because Dennis could do him bodily harm. Further, Rutherford testified that he heard Dennis Warren threaten to shoot Connors and that he had seen Dennis Warren with a gun in the front seat of his car. We believe that this was sufficient to support the conviction, as Dennis Warren both aided and abetted Harris and personally threatened Rutherford. Although Rutherford did tell FBI agents who visited the farm that he was not being mistreated and felt free to leave, he escaped that very evening, went into town, and telephoned the FBI to tell them what the conditions were "really like."
 
 
 21
 Although somewhat weaker than the evidence adduced against Dennis Warren, we also conclude that the evidence was sufficient to support Richard Warren's conviction as an aider and abettor of Harris and Dennis Warren on this count. The evidence showed that Richard fraudulently induced Rutherford to go to the labor camp. Although apparently unknown to Rutherford, Richard Warren was identified by other witnesses as one who guarded the workers at night and patrolled the road to prevent their leaving. Rutherford, although he did not identify Richard as one of his guards, knew that he was not free to leave. In addition, Richard Warren said, "[t]hat's right" when Dennis Warren in response to Rutherford's comment about leaving told Rutherford that he, Dennis, could do Rutherford bodily harm.
 
 IV.
 
 22
 The Sec. 241 Convictions of Harris and Dennis Warren
 
 
 23
 Harris and Dennis Warren were convicted of conspiring to injure, oppress, threaten and intimidate at least six laborers (who were United States citizens) in the exercise and enjoyment of their federal right to be free from involuntary servitude and slavery, resulting in the death of one, Robert Anderson. 18 U.S.C. Sec. 241. Their argument on appeal is that the death of Robert Anderson was outside the foreseeable scope of the conspiracy, and therefore does not fall within the "if death results" punishment-enhancing clause of Sec. 241.[12] This clause permits the punishment to exceed the ten-year limit; Harris was sentenced to life imprisonment and Dennis Warren to twenty years' imprisonment.
 
 
 24
 The parties agree that under United States v. Guillette, 547 F.2d 743, 748-50 (2 Cir.1976), cert. denied, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977), and United States v. Hayes, 589 F.2d 811, 820-22 (5 Cir.), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979) (identical language under 18 U.S.C. Sec. 242), the phrase "if death results" requires only that the "death ensued as a proximate result of the accuseds' willful violation of a victim's defined rights," 589 F.2d at 820, rather than that the death be the direct and intended result of the violation. Thus, where death foreseeably and naturally results from the rights-violating conduct,[13] the statutory requirement for enhanced punishment is met.
 
 
 25
 The evidence indicates that Robert Anderson was already ill when he arrived as a migrant laborer at the camp; indeed it appears that he actually was wearing a hospital identification band on his wrist. On the day before he died--only two days after arriving--Anderson was in the field picking potatoes very slowly, obviously weak, but each time he stopped and sat down, Harris would come over and tell him to get up and get back to work. Further, when Anderson then went to sit in the shade, Harris went and brought him back to the field to work. Later that night, Anderson, part of a work crew, began vomiting blood, and Dennis Warren was told about this. The next day, Anderson would not get up for work, telling Harris that he was sick, but Dennis Warren grabbed Anderson and forced him onto the bus for work. On the bus--which Harris and Dennis Warren were aboard--Anderson was again vomiting. Out in the field, where it was extremely hot, Anderson sat down, but Harris hit him with a stick and ordered him back to work. Harris refused a request by Anderson for a doctor and medicine, again ordering him to work. Anderson soon thereafter collapsed in the field, and was carried back to the bus by some other workers. By the time that the county rescue squad arrived, Anderson was dead. The medical experts gave the likely cause of death as heat stroke, although one doctor indicated that alcohol withdrawal was a less-likely alternative.
 
 
 26
 Viewed in the light most favorable to the government, we think that this evidence clearly suffices to support the jury's conclusion that Anderson's death was proximately caused by defendants' unlawful conduct. Knowing that Anderson was very ill, defendants physically forced him to continue working, performing hard labor in a potato field. We think that, under these circumstances, death was a foreseeable and natural result of the holding of Anderson to involuntary servitude, and we therefore find that the "if death results" requirement was amply proved by the evidence adduced at trial.
 
 
 27
 We also reject defendants' contention that the district court improperly admitted the only evidence showing, as required under Sec. 241, that Anderson was a United States citizen. There was, indeed, no identification on the person of the deceased, and his identity and citizenship were established by matching his fingerprints to those on an FBI file card. The state medical examiner who took the fingerprints from the deceased identified the fingerprint card used by the FBI as the card that he had made from the deceased. The FBI fingerprint expert testified that this card had matched a card in the FBI files, which gave the name Robert Lee Anderson, born in Philadelphia on March 4, 1941. The chain of custody of the fingerprints was therefore complete, and United States citizenship was established. In addition, the government also introduced the birth certificate of Robert Lee Anderson, born in Philadelphia on March 4, 1941, corresponding to the information contained on the FBI file card. Thus, the requisite showing of the citizenship of the deceased was made.
 
 V.
 
 28
 The trial court's dismissal of Richard Warren's Sec. 241 conviction.
 
 
 29
 The indictment charged all three defendants as co-conspirators in a single conspiracy to oppress at least six laborers in the enjoyment of their federal right to be free from involuntary servitude, which conspiracy resulted in the death of laborer Robert Anderson. 18 U.S.C. Sec. 241. The district court instructed the jury that if it found the defendants not guilty of a conspiracy resulting in death, it could then find as a lesser included offense guilt of a conspiracy not proximately resulting in death. The jury found both Harris and Dennis Warren guilty of conspiracy resulting in death. However, the jury acquitted Richard Warren of a conspiracy resulting in death but convicted him of a conspiracy not resulting in death.
 
 
 30
 In response to post-trial motions from the three defendants, the district court upheld the convictions of Harris and Dennis Warren, but entered a judgment of acquittal as to Richard Warren on the conspiracy charge. It correctly noted that only one conspiracy had been charged and proven at trial, and that under the law of conspiracy all co-conspirators are equally responsible for the acts of others done in furtherance of the conspiracy. United States v. Snead, 527 F.2d 590, 591 (4 Cir.1975) (per curiam). Therefore, the district court concluded that the verdicts were logically inconsistent, for either the conspiracy proximately resulted in Anderson's death or it did not. The court then reasoned that because the inconsistency was within a single count of the indictment, it had to be resolved despite the general rule that inconsistent verdicts are permissible. Looking for the least intrusive and most equitable remedy, the court granted Richard Warren a judgment of acquittal on the conspiracy count, reaffirming the convictions of Harris and Dennis Warren. It is, of course, the government's appeal which raises the correctness of this ruling.
 
 
 31
 The starting point for our inquiry is Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), where the defendant had been charged in a three-count indictment with maintaining a common nuisance by keeping for sale intoxicating liquor, unlawful possession of intoxicating liquor, and unlawful sale of such liquor. The evidence--that defendant sold liquor to prohibition agents--was the same for all counts, but the jury acquitted as to counts two and three, convicting only as to the nuisance count. The Supreme Court affirmed the conviction, holding that:
 
 
 32
 Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold. As was said in Steckler v. United States (C.C.A.2d) 7 F. (2d) 59, 60:
 
 
 33
 "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."
 
 
 34
 284 U.S. at 393, 52 S.Ct. at 190 (citations omitted).
 
 
 35
 The rule in Dunn was applied to inconsistencies between multiple defendants in United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). There two indictments had charged a company and its president with violations of the Food, Drug, and Cosmetic Act. The jury acquitted the corporation on all charges, but convicted the president, Dotterweich, on all charges as an agent of the company. The Court rejected a claim that this constituted an impermissible inconsistency, holding
 
 
 36
 Equally baseless is the claim of Dotterweich that, having failed to find the corporation guilty, the jury could not find him guilty. Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries. Dunn v. United States ....
 
 
 37
 320 U.S. at 279, 64 S.Ct. at 135.
 
 
 38
 This court, also, has recognized that a jury may exercise lenity in order "to prevent the punishment from getting too far out of line with the crime." United States v. Scheper, 520 F.2d 1355, 1358 (4 Cir.1975), quoting United States v. Maybury, 274 F.2d 899, 902 (2 Cir.1960).
 
 
 39
 We think that the verdict in the present case, while in conflict with the evidence and applicable legal rules of vicarious guilt, is a legally unassailable product of jury lenity. The evidence at trial showed that although Richard Warren was part of the conspiracy to deprive workers of their right to be free from involuntary servitude, he had no part in the events directly involving Anderson on the day before, and day of, his death. The verdict, convicting Richard Warren of the lesser included offense, therefore is explainable as the jury exercising leniency so as to avoid the legal rule that co-conspirators are equally responsible and equally punishable for the acts of their partners. Because jury lenity is the basis for the Dunn and Dotterweich rule that inconsistent verdicts may stand, and because the jury's findings in the present case are readily attributable to such lenity,[14] we conclude that Richard Warren's conviction was not subject to reversal by the district court.
 
 
 40
 Nor can we agree that the result in the present case must be different because the three co-conspirators were charged, and the inconsistency occurred, within the same count of the indictment. This "rule," which Warren would derive from United States v. Fox, 433 F.2d 1235, 1238 n. 21 (D.C.Cir.1970) (dictum), actually is nothing more than the rationale from Dunn that inconsistent verdicts may stand if they could have been separately charged and tried.[15] Although the indictment did charge the three defendants together within the same count, it is clear that they could have been separately charged and tried. In Standefer v. United States, 447 U.S. 10, 21-25, 100 S.Ct. 1999, 2006-09, 64 L.Ed.2d 689 (1980), the Supreme Court held that nonmutual collateral estoppel may not be applied against the government from one criminal case to another criminal case involving a different defendant.[16] Central to this holding was a recognition that juries may return inconsistent verdicts based on compassion or the exercise of lenity. Id. at 22, 100 S.Ct. at 2007. Given that the defendants here could have been indicted and tried separately, without res judicata or collateral estoppel effect against the government, we conclude that the Dunn rationale is applicable to this case, and that the inconsistent verdicts must stand.[17]
 
 VI.
 Summary
 
 41
 To summarize our holdings: We reject defendants' claims that they were denied their Sixth Amendment right to effective assistance of counsel. Defendant Harris' convictions under 18 U.S.C. Sec. 241 and 18 U.S.C. Secs. 2 and 1584 are affirmed. Defendant Dennis Warren's convictions under 18 U.S.C. Sec. 241 and 18 U.S.C. Secs. 2 and 1584 are affirmed. Defendant Richard Warren's conviction under 18 U.S.C. Secs. 2 and 1584 is affirmed, but the judgment of acquittal entered by the district court as to the 18 U.S.C. Sec. 241 count is reversed.[18]
 
 
 42
 Nos. 82-5049, 82-5052 and 82-5157 AFFIRMED; No. 82-5181 REVERSED.
 
 
 
 [1]
 18 U.S.C. Sec. 241 provides:
 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States ... [t]hey shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.
 
 
 [2]
 18 U.S.C. Sec. 1584 provides:
 Whoever knowingly and wilfully holds to involuntary servitude ... any other person for any term ... shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 [3]
 Id. Secs. 2 and 1584. Harris was also convicted of kidnapping laborer Joseph Simes with intent to hold him as a slave, in violation of 18 U.S.C. Sec. 1583
 
 
 [4]
 Harris does not appeal from his conviction for kidnapping Joseph Simes or holding Harvey Rutherford to involuntary servitude. Dennis Warren does not appeal from his conviction for holding Craig Connors to involuntary servitude
 
 
 [5]
 Named after United States v. Garcia, 517 F.2d 272 (5 Cir.1975), this hearing would advise the defendants of their right to independent counsel. Appropriate procedures are now set forth in F.R.Cr.P. 44(c)
 
 
 [6]
 It asserted further that Williams was a potential prosecution witness at the trial. In fact he did testify for the government when the case was tried
 
 
 [7]
 The government's motion also requested inquiry into the joint representation of the two Warrens by the same firm
 
 
 [8]
 Although Harris did have independent counsel, he urges that because his trial counsel was assigned to the case at the last minute and took a back seat to the Warrens' attorneys that he, too, was denied effective assistance of counsel. In light of our conclusion that there was neither actual conflict nor adverse effect on the defense for the Warrens, we need not reach this issue
 
 
 [9]
 We note that Williams never invoked his Fifth Amendment right not to incriminate himself
 
 
 [10]
 The strategy was partly successful. Harris and Dennis Warren were both acquitted on one count of holding a laborer to involuntary servitude and another count was dismissed before the case went to the jury
 Moreover, it is clear that defendants could not assert as a defense to their criminal liability that they were only following Williams' orders; such a defense may at most be submitted in mitigation of punishment. See McNamara v. Johnston, 522 F.2d 1157, 1165 (7 Cir.1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). In the present case, it cannot be said that defense counsel's decision to choose the defense that the government had not made out its case, rather than assert an "I was only following orders" defense in mitigation of punishment, shows that counsel's performance was other than deliberate, objective strategy unaffected by any adverse interest of Williams.
 
 
 [11]
 We do not, however, foreclose the possibility that the defendants may be able, by filing a motion under 28 U.S.C. Sec. 2255, further to develop the record and thereby establish the requisite actual conflict and adverse effect
 
 
 [12]
 See supra note 1
 
 
 [13]
 Therefore, the conduct must be such as to create an unacceptable risk of loss of life. Hayes, 589 F.2d at 821
 
 
 [14]
 Where as here the jury's inconsistent findings are explainable as an exercise of lenity, that explanation--rather than confusion or vindictiveness resulting in heightened punishment on the other count or of the other defendant--will be credited. Dunn, 284 U.S. at 393-94, 52 S.Ct. at 190. Therefore, cases such as Marquez-Anaya v. United States, 319 F.2d 610 (5 Cir.1963), and Fuller v. United States, 407 F.2d 1199, 1223-25 (D.C.Cir.1968) (in banc), cert. denied, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969), in which the defendants were convicted on both of two inconsistent counts, are not relevant here, for they cannot be explained by jury lenity
 
 
 [15]
 Indeed, the only case cited by Fox was Gillars v. United States, 182 F.2d 962, 966-67 (D.C.Cir.1950), and that case merely quoted Dunn 's holding that each count in an indictment is to be regarded as a separate indictment
 
 
 [16]
 In Standefer, the Court affirmed the conviction of an aider and abettor under 18 U.S.C. Sec. 2, even though the "principal" had already been acquitted
 
 
 [17]
 We further note, in passing, that the remedy ordered by the district court would not be appropriate if the inconsistency were not attributable to leniency, but instead was laid to jury confusion. Although the district court inferred that the jury first found Harris and Dennis Warren guilty of conspiracy proximately resulting in death and then became confused as to Richard Warren, it is logically equally possible that the jury first decided that the conspiracy, of which Richard Warren was a member, did not proximately result in death, and then became confused when it considered the roles played by Harris and Dennis Warren in the death. There would be no better logical reason, therefore, for entering a judgment of acquittal for Richard Warren, as was done, then for entering judgments of guilt only as to the less included offense for Harris and Dennis Warren, bringing them into line with Richard Warren. However, because here the inconsistency is attributable to jury leniency and the inconsistent verdicts must therefore stand, we need not resolve the problem of what would have constituted proper relief
 
 
 [18]
 As a result of our rulings, the district court's original Judgment and Probation/Commitment Order, filed February 2, 1982, is reinstated